v. Douglas Burgum U.S. Secretary of the Interior et al. Ms. Walker, for you, balance. Ms. Bray, for you, balance. Blase, the court. Morning. Morning. CVMT seeks reversal of the 2024 District Court Cop decision for two primary reasons. First, the lower court did not follow the remand, what we refer to as CVM3 decision, or the remand decision, that found ASIA-Epawhawks' decision unreasonable and allowed for the reorganization of the District Court. And two, claims ASIA-Newland's decision failed to protect the tribe's political integrity when it allowed a 1929 Indian census of all Calaveras Miwoks to establish the tribe's membership criteria. Felix Cohen, a scholar of federal Indian sovereignty law, wrote, courts have consistently recognized that one of the Indian tribe's most basic powers is the authority to determine questions of its own membership. A tribe's right to define its own membership for tribal purposes has long been recognized central to its existence. I don't quite understand how that squares with the litigation position of your clients when there were other tribal members trying to exclude them from the group that would write the Constitution for this tribe. Got it. There's a long history in this case, but our position is the 1915 descendants, which is about 11 people, they stood for when they were fighting the Sylvia Burley faction, that they had a larger community. They had developed a community of folks and had identified them. So it was a misinterpretation of Judge Cobb that the descendants wanted to create this very small tribe. No, they stood in the earlier cases for her faction of three or four people was not the tribe, that they wanted to go back to the historical community and they had identified them. I understand that, but if what you just led with were the rule, then those three or four people who wanted to define the tribe would have been able to exclude your clients when your clients were on the outs, as you just said they once were. Tribal enrollment is not easy to understand, but I've created some tribal enrollment ordinances and I kind of know how it works. Basically, it's not off of one particular role. Federal or state census roles are just inherently an error. It's up to the tribe to look at what they consider a base role of the community, and sometimes that includes direct line lineal descendants and sometimes it includes collateral descendants. This is where I think the Cobb court got confused, and it is confusing, because when you start to look at a collateral descendant. For example, I'll just use another tribe, but the Nansman in Virginia were founded on the Bass family, and they had like seven children, and four of those brothers went off to North Carolina and established other tribes. Are they direct line lineal descendants of a base family role? Yeah. But the collateral members that left and went to other tribes are not part of the group. I guess my question is, is a little bit kind of a step 1 question. Step 2, you're going to the question of who should or should not be in this tribe or in the group that writes the constitution for this tribe. But my question is, before that, my question is, does the government have a role in saying this group is too small a group to write the constitution that will define membership in the tribe? And you seem to start your argument today by saying, no, the government doesn't have a role. That's something special for only tribes to do. But if that had been the rule, then yeah, I see what you're saying. Your clients would have lost their earlier lawsuits. I mean, there has to be a baseline somewhere and the government is called on to set it. So either there's federal involvement either way. If we vacate the Nolan decision, if we affirm. There's court involvement and there's federal involvement. I know I'd like to make the distinction. All right, with the organization process, where the federal government was charged after what we call CVMT 3 to form an organizational process. Mr. Washburn, who's quite a scholar and had just recently revised the 2015 revisions to the federal acknowledgement rules. He defined what the government had identified as historical members of the tribe. He wrote in his decision that if those initial members, which could include some members off the 1929 census, but he knew that that census was too broad. So he was allowing the initial historical members to decide who could be the initial putative group, the families that had been connected to that community. That is what they stood for and they had it in their affidavits that they had a community around Sheep Ranch. So it was a misunderstanding that the court below thought that they were only talking about only had to be them. It didn't have to be them. They identified other families. And that's why I'm saying in most every tribe there are direct descendants they know of and there's family groups that have been maybe a collateral relatives that have been in. Now, I just want to go through the numbers on these census. Go back to that. I just wanted to make this distinction. The BIA looks to constitutional issues, election issues in China and supposedly should draw that line of demarcation in that governance piece. But then when you come over to the tribe and potentially tribal courts, that's when they determine who should be the membership in the citizenship. And I look at this as kind of an election boards where if the local legislator says, oh, we need a certain type of ID for voter registration, then that's what they can look at and say, you've either met that or not. But they don't generally go behind it to see if that actual membership was legal or not. I mean, the registration was legal or not in terms of your ID. Is that correct? Well, elections generally when tribes are enrolled in the tribe, they get a federal ID that we're a member of the tribe and not all tribes. The federal government has the authority to come in and do a secretarial election. Most tribes now have done away with that, having the government come in and certify an election. But what I'm really getting at is BIA should be governance. The tribe should be looking at its actual membership citizenship. And I feel like in this decision, then what we're grappling with is that under the Washburn decision, there was some misinformation with respect to the whole Jeff Davis, John Jeff descendant piece. Newland then goes ahead and revises the decision to go back and include all of that. But I'm not sure if when you're asking that the Newland decision get reversed. Are you asking us to accept the Washburn decision, which had kind of some misinformation about the genealogy piece to Jeff Davis and John Jeff? Judge Childs, I want to address the misinformation. Kevin Washburn and his decision had attachments that he reviewed. He reviewed the burly deposition and he reviewed an important attachment that was left out of the administrative record by the government. That's what we call attachment L and the new appendix. Attachment L, Washburn had, which was director Riesling, had reviewed this early constitution when they were trying to organize the tribe. And he got a solicitor's opinion back that said the 1929 census was too general to be legally sufficient criteria for membership. And he wrote that back and said, this constitution is not going to fly. Kevin Washburn had that. Also, we had the deposition of Sylvia Burley, where she was claiming to be a Jeff. And she wasn't saying she was, but she was lobbying very hard that the Jeffs should be part of these eligible groups. Where the failing was by the Department of Interior was their due diligence to do the genealogy, which was not hard to find that John Jeff was not the son of Jeff Davis. And so if they had done that, that would have been where you go. So now I just want to say, I know it sounds like unfair to people to go and let one group or another decide membership criteria, but there's a process and the court articulated it on the remand. It said they had to identify whether the tribal, you know, the group represents members of the tribe. And before invoking the principle of self-government, it's incumbent on first to determine where a duly constitute government actually exists. So you have to go to historical documents identifying who is historical to get that. And then the secretary must ensure that they deal with the tribal government that actually represents members of a tribe applying the trust obligations. So there's a point where the BIA is facilitating the organization and facilitating an initial group that would sit down with the genealogy and with the history and determine it could be the initial putative group, people that they know are families connected to Sheep Branch with the historical connection, to then set membership criteria and then move forward with a constitution. That's the step that got confused. What criteria would you use to differentiate Miwoks who deserve membership from those who do not? Well, I'd have to be speaking for them, but from everything I've read, it comes down to this. Calaveras County is a large county, thousands of, a thousand acres, and there were Miwoks in all different parts of that county. And the ones around this mining town called Sheep Branch, there was a group of families that lived there and still around that area. And they know each other. And there's a history there. And so they know it. And that's what you would base it on. You'd base it on history, not whether you appeared on a 1929 census. And the numbers are, I'll just give it to you quick, in 1915, they identified 13. In 1927, they identified 25 members of the Sheep Branch Ransforia. And then in 1929, they did a Calaveras County census of all the Indians in Calaveras County. That was 147. 137 were Miwoks. You minus out those 25 that they identified two years earlier as Sheep Branch Indians, and you got 100 Miwoks that they identified that didn't have the historical connection to that ranch area. I'm having trouble still distinguishing between your position on what would be appropriate for your clients to write into a constitution about who belongs, and the people who even sit down to make those determinations. And it would still be open if under the Newland decision, it is still open to all the people who are invited to the table to frame the constitution to say, you know, we've gone off. We have other tribes. You, you know, 25 are really the ones that we all understand have this connection to the Sheep Branch. But it hasn't happened yet. Well, what happened when this group challenged the secretarial election, it was because they were so overshadowed by the people that came in all claiming to be related to Jeff, John Jeff, that their opinion wasn't heard. And that's why they challenged the secretarial election, and they won. And that's when the superintendent, Amy Dutschke, came back and said, sorry, we've got to go back to the washroom. Three years later, that's when the whole thing was. Now, look, in the Jeff family, and boy, you get lost in Jeff's, and there's a lot of Jeff's in the Miwok community in all of California. The John Jeff and Tilly Jeff had nine children, and they were in West Point, and they were in the CCO, if I say it right. And that's where they lived, and that's where they're buried. And some of their children had offspring that ended up around the Sheep Branch community. Maple Hodge was one of their grandchildren, and she married a Hodge, and that's how she ended up in that community. So there were some that migrated into that community, but not all nine children did. I guess I'm not understanding. You're answering my question, which is, why doesn't it make sense to have an overbroad group of people, of potential ultimate members, be part of the group that's discussing that? Yeah, because you have people that want to be a member, as opposed to people that have the historical connection to be a member. And if you have more of those people that want to be a member than ones that have the historical connection, the people with the history connection get wiped out. And that's what happened to me. Tell me, you contend repeatedly on brief that the Newland decision violated the district court's remand decision in the CBMT-3. Why do you think that? What is it that violates the remand? Specifically was, he said, first you have to establish a tribe that existed. And the federal acknowledgment process, that would be looking at around the turn of the century and back, was there a historic tribe that continued to exist? This had been identified in some early 1915 census, 1906. There was an 1827 identifying Miwoks around that mining town. So you have that early identification. But aren't there multiple Miwok tribes? And we're supposed to be distinguishing, you know, for this purpose, the California tribe. Right. But there's, in that county, there were multiple, over that hundred years, multiple Miwok communities. And we're trying to identify the ones of the history to Sheep Ranch. So what I'm saying is, you think about the Great Sioux Nation, Great Sioux Nation, six chiefs, they split up. And they all, like, have different tribes with interrelations. But you can't be a member of just any Sioux tribe. You have to go to the history of that tribe. That's what we're saying here. And I've done it. And I know if we were tribe. I understand what you just said, that you think the group that will write the Constitution should be limited to those with a connection to Sheep Ranch. Did I hear that correctly?  Okay. Is that group any bigger than the 1915 census descendants? Yes. Okay. That's identified in the affidavits that were submitted. And they're part of this record of people that the group I work with. Was that group bigger than the 1927 census? Not the 29, but the 27. You seem to like the 27. Well, no. Well, the 1915, what I'm saying is the modern descendants of 1915, basically that 25 that were identified in 1927 were off those same families. But it didn't turn into 147 two years later. So the descendants of the 1927 census, is that a smaller group than people who are descendants from American Indians with a connection to Sheep Ranch? No. No, there's more. There's, you know, as time moves on, you know, you trace the families that connected into Sheep Ranch as part of the community. But there's also, I mean, in the Newland decision, one of the observations is that the 1915 descendants actually were no longer there since 1940 and descendants of the 1929 census were there and had the connection. So there's a question also of the time for the historical inquiry. And you're insisting on a time, I mean, understandably that includes your clients and doesn't include a large number of other people whose views might outweigh. But what is the principle on which you rest that choice? You say it's the connection to Sheep Ranch, but that connection has been lost for 80 years, no?  The Hodges, that family, and other families collateral to the Hodges that were known to have been involved in that community over 75 more years. Let's take Sylvia Burley. We're not trying to case on her. But the reason this controversy came up was she didn't connect in to Sheep Ranch until 1998. And I have the list of places she lived since she was born, and none of them were at Sheep Ranch, and she wasn't connected in. And she defrauded them. You know, she disenrolled Yakima and ran off with the money. So that's what they're fearing. Did Mabel Dixie have a connection to Sheep Ranch? Did who? Mabel Dixie. Yeah, she lived at Sheep Ranch. She was living there. And would her heirs be in the group that you think should be the group? Yeah, but her last heir just died. That was Yakima Dixie. How big was the Sheep Ranch? I meant her descendants. Sorry. Go ahead, Judge Charles. I'll come back to mine. That's okay. Go ahead. Finish your thought. Well, would Mabel Dixie's descendants or the descendants of her heirs, would they be in the group that you think should write the Constitution? Well, Yakima Dixie was her son. She had four children, her son, the last son that died. She was Mabel Hodge Dixie. She married the son of John Hodge, Joe Hodge, and John Hodge was the brother of Patterson Hodge, which was on the 1915 list. But his brother, John, died in 1913, so he wasn't on the 1915 list. But she married into that Hodge family, that Hodge community. Did Mabel Dixie have any heirs at the time she died? No. No heirs at the time she died? No. And no descendants? No, she had Yakima. I'm sorry. Yakima was alive and he lived at the thing. Okay. He did not. Yakima had no descendants. No. But she goes back to the Hodge line. Okay. And how big was the Sheep Ranch area in 1915? I guess I'm trying to get to the point that it seems like there can't be many people on the land and that some of these tribes were very small. Yeah, it was two acres. And it remained two acres in these different reports, the Kelsey report, the Lips-Michael report, all the way up until 1960, when it was identified as .9 acres. Government sort of misrepresents that because they say it was always .9. No, it was identified as two acres. What they believe happened is Lena Hodge, that line, was living on one part, and there was some folks on another small shack. These were like just one-bedroom places. And now you're saying that Washburn and his decision reviewed and decided not to include the 1929 census because it was too broad? Yes, because it was not – you have to have specific membership criteria, not general. And the solicitor's office had given an opinion to Dale Reisling, the regional director, that it wasn't legally sufficient. I still don't understand your specific membership criteria. You said earlier in answer to my question sort of, you know, maybe the people who are out there will know it when they see it. But what is the specific criteria? No, when you get into history, you see families, and some of them, like Maple, Hodge, Dixie was a collateral relative in a way because her descendancy up through the Hodge line did not appear on the 1915 census, but she was connected. So what you see is people that are identified in those affidavits that came and lived there or were part of that Miwok community, and they participated in it. And there's history there. It's not that old where they go back and they know what families were part of that sheep ranch community. Indian people are about that. They're about family. They're about community. But who should decide about these citizenship questions? Is that the tribe itself or does this go to a tribal court? We're getting so into the weeds now of the land. I'm just trying to figure out should BIA be making these types of determinations or is that for the tribe itself? That's what we're here to stand for is that, like Felix Cohen, it's the Martinez case, is that only a tribe, only someone with a historic connection. So Kevin Washburn, who knew well how tribes get their federal acknowledgement and he knew well this process is, I know it sounds nebulous, but they basically start with a role, and they try to go as early at the turn of the century. Roles that come in after World War I and II aren't considered as reliable because everybody spreads around after the world wars, but those early censuses identify an historic tribe. And then from there, you look at the community that built around that historic tribe, and there's history to that. But that's not for the BIA to wave a wand and say, this is your history. That's a no-no. But you do think it was for Washburn to wave a wand and say, that was your history. Yeah, Washburn was BIA. He was a representative. You're just saying you think the substance of his decision was more in keeping with what the tribes would have decided had they been empowered to so decide without any BIA involvement. But either way, there is federal involvement. And so your argument that this is about who decides, it just seems to me neither here nor there, because either way, it's the same institution. I know. But this is a big distinction in federal Indian law because of Indian sovereignty, and it's hard to grasp. The BIA is involved in the exact same way with different substantive reasoning, whether we rule that the Newland decision survives review, or whether we rule that it doesn't and default back to Washburn. So I'm just not following the arguments that the feds should stay out of it. I understand that as an historical, as an institutional perspective, but I don't think that is a choice before this court.  What Washburn was doing was the process, and that's why I was quoting from the remand decision about how they identified a process. And an organization of a tribe process is different than when you declare them federally recognized. This tribe was already identified as a federal community, and the BIA was on our side fighting the faction that was defrauding the tribe. They were definitely supporting us. I was one of the people that went and we had the BIA funds withheld and the BIA had run off with it and disenrolled Yakima. So the point of this. Can you explain then how the IRA works here? I'm thinking that we need to start back with that intent. Right. The IRA defines what is a member, and it says a member, and this is in the organizational process, is it has to be a member that's enrolled pursuant to tribal criteria established by the tribe. So what we're talking about here, here's splitting the hair, is you have Kevin Washburn was identifying who was part of a historic community, and then those people part of the historic community can add the people they had on affidavits that they said were collateral relatives that were part of that Miwok community to sit down among themselves and decide, you know, the historic criteria for membership. And then once they get those criteria, they can then enroll the future membership to vote on a constitution. That's how it works. So he was not crossing, I know this sounds vague, but he was not crossing the line of the BIA comes in and tells the tribe, this is the role you use to establish membership. This is the criteria you use to establish membership. He clearly said that is to be left to the tribe, not the government. So there's a role, the BIA had a role in verifying that genealogy. You bet they did. They didn't do their due diligence, and that messed this whole thing up. Okay, so why is your desire to revive the Washburn decision? It's not revive, it is what stands. Because it was the. And in saying that it stands, it had in there, when we go back to the genealogy piece, you know, that was later error in its assumption about the descendants of Jeff Davis and the John Jeff matter. So do you take that to mean that all of that swath of people would be in, or do you take that to mean that because there was an error that we left with only Jeff Davis, who was the only person in the 1935 IRA voters list? I've been trying to say the opposite. I'm trying to say the opposite. The court thought that that's what our group stood for, was we didn't like the five with Burley, and we're the five, or whatever. It's not about that. It's about they were the historic descendants that then can look at who would be the other collateral members. Tribes are made up of members that might have direct line descendancy or members that have been so connected to the community, they're collateral descendants, and they have these interrelations. That's almost in every tribal community. So they sit down and then they decide what is the base role we want to use and what's the criteria for membership, and that's a big distinction. It's not the government's place. And, again, our group stood up to the last secretary of election because their view wasn't being considered at all. The people that wanted to be part of that tribe were dominating, not the people that had the connection. Okay, be real clear about your remedy. Are you asking reversal of summary judgment, vacating of a particular order, things like that? Yeah. What we are asking for is that now that there is some genealogy that's verified about that, then it's about people coming forth to decide who the – we call them putative group because even the descendants aren't members yet. They're part of an organizing group. They're not officially members until the criteria are set, and they become members. So that's why you call it an organizing group. You have a putative organizing group, and the BIA and the tribe can sit down and look at the history that shows what families had a connection into that tribe historically, and it can be because of their participation in the community. And they're identified. We identified them in those early affidavits. They weren't lying. Okay, but I'm still trying to get to legal terms in terms of what is the conclusion of an order supposed to say. So the order would remand back consistent with the Washburn decision to organize the BIA to assist with organizing, which they were going to start to do based on the history of the tribe and the connection to Sheep Branch. So there I go, where we had a family like Burleigh, not until 1998, any of the Miwoks connected to Sheep Branch knew of her. And she got in, and then she took it. That's what they don't want. So again, on the remand, are you saying that it goes back to the tribe to determine its membership? Membership criteria, yes, exactly. And then the BIA looks at all of that. Yeah, well, right. The BIA in organizing this tribe, you know, has a role, because they had a role before. But they come in now, they've got the genealogy, and they put out a notice like some have refused to submit a blood certification form. Why? Because they can't show that connection. So they have the people that want to be in the tribe come forward with their evidence that they had any kind of historical connection to the community. Then you come up with a group, an organizing group, that sets the membership of the tribe, and then there's a vote on a constitution around an organizing group. We're not saying it's only the 1915 descendants. We're saying there's collateral relatives or the relatives that had a connection in the Sheep Branch. Maple Dix, Hodge Dixie was collateral. But there's a number of them that were into that community. Does the BIA have a proper role in approving the organizing group? Yeah. I think if they go back, that's why I'm saying this, is we're not trying to go back to five people. So I think that's right, and I think there is consensus between you and the government, and I agree with you both. The BIA has a role in approving the organizing group, and that just means the question, I think the only question is did the BIA carry out that role appropriately when it issued the Newman decision? And my answer is no, because it didn't protect the political integrity of the tribe, which is what the remand decision said. It said the secretary must ensure she deals or he only with a tribal government that actually represents. So our role and our only role, we read that Newman decision and we answer the question, did it protect the integrity of the tribe? And we do that under arbitrary and capricious review with a lot of deference to the Newman decision in terms of facts. Correct? Right. That's where you go. One thing is we feel the court, this was before the Loper decision gave Newman too much deference. He didn't follow the section part 81 reorganization rules where the membership criteria is set by the tribe. What statutory text do you think the Newman decision interpreted incorrectly? I have it right here. Let me grab it. Okay. Assume the was an historic tribe with Alpine 1981 regulations. And then I have a definition of what a member is. I'm fumbling around. But basically under part 81, the regulations state what a tribal member, the definition of a tribal member. And that is a member. Is that a regulation? Yeah, it's a regulation. I haven't heard. A regulation under the IRA. Under the IRA. A provision of the IRA? Yeah. Under the part about organizing a tribe. And they're saying a member for the purpose of organizing a tribe is someone that applies to the membership criteria, that satisfies the membership criteria and the tribe can be enrolled. And there's a disagreement between you and the government about whether that definition means what you just said it means. I don't know. I haven't seen that in their arguments here. I guess what I'm saying is I don't think you and the government disagree about the meaning of the statute. And if that's the case, Loper is irrelevant. Loper goes to whether the government gets deference when it's interpreting the statute. I think where you and the government disagree is while you agree about the meaning of the statute, you disagree about how it's being applied to the facts of the case.  So Loper is irrelevant. Well, a court, in her opinion, gave Newland's decision. She called it, she was going along with his urgency to do this as giving him deference. Yeah. Under arbitrary and capricious review. Yeah. So you're not the only one. It seems like every time we get a case that has nothing to do with statutory interpretation but involves an agency, the challenger thinks Loper means they win. Well, interpretation is, you know, about how to carry out the statute in terms of organizing the tribe. And so we would say that she gave him too much deference. Again, our position is that the group that was showing up trying to be in this process were totally overshadowed by the people that wanted to be a member and they knew did not have the historic connection. And that's why they wanted the process to show more integrity. So we stand on that side. And, you know, are you arguing that the Newland decision was arbitrary and capricious because there was evidence before assistant secretary Newland that the me walks in the 1929 sentence were not necessarily members of the California Valley me walks. Right. In other words, there was good evidence in the record that, first of all, Sylvia Burley was a Jeff, but it was clear she wasn't part of that. So not every Jeff that's on the 1929 census that they claim were related to Jeff Davis was part of that tribe. Number one. And number two, they had a decision from the solicitor's office looking at whether to use in the constitution. I think it was in 2013, the 1929 census and the solicitor's office says, no, the census is too general. It's not specific enough. It's not legally sufficient as a membership criteria. It didn't identify who was who. It didn't even identify. It had some of the sheep ranch people on it, but they didn't identify people as tribe. Few were identified as with the total main tribe, but it was just a general list. That general list was not accepted by any, anybody as these are the members of our tribe. And Calaveras is a huge county, thousand acres, a lot of Indian people. Judge Shouse, you have further questions. Yeah, I know we've gone over time, but we'll give you a limited amount of time for rebuttal. Thank you. Appreciate it. And in the meantime, we'll hear from Ms.  Please the court, Mary Gabrielle Sprague for the department of the interior, your honors. The essential question, as you point out is whether the Washburn and Newland decisions, uh, properly fulfilled the government's role to guide the electoral process. Um, the court's decision, as you noted is under arbitrary and capricious review. Uh, and we submit that the decisions were well-based, uh, in the law, uh, and in the facts of this case, um, and should be upheld as reasonable. You said you want to uphold the Washburn and Newland decisions. I don't think you mean that. The Washburn decision as revised by the Newland decision.  Um, the basic principles of the, uh, Washburn decision. Um, it was that there was a larger tribal community. He rejected the organizing effort, which had included, um, about 200 people in the process, but found that there was insufficient outreach to the community, which had been repeatedly identified by, uh, members of the community, um, as about 250 people. Um, and, uh, Washburn was also responding as did Newland, um, to the precedent, um, of this court and other courts, um, that held that the larger tribal community should be included in the organizational process. But when you're talking about the larger tribal community being included, to me, that's a different, um, kind of thought process about the greater community being involved in the tribal decisions, as opposed to determining its membership. Correct. I mean, your honor is correct that the process is that,  you interior gathers in, um, what is understood to be the larger tribal community, which is the term they typically use. And it's left to those people to decide in the constitution, what membership criteria they wish to propose. And they can propose a smaller group or a larger group.  but at the outset, um, and this is clearly, and you're talking about before, you're not talking about the choice in the constitution, but you're talking about, they can choose a larger or smaller group to be the framers of that constitution. Interior's duty is to gather in the larger tribal community. Uh, as this court recognized in his 2008 decision, although the court there was not addressing a secretarial election process, it was addressing a constitution that was offered to interior for approval without a secretarial election process. But in either case, uh, that the majoritarian principle to bring in the larger tribal community among those people, they write a constitution, which will have membership criteria. And then that group votes on the constitution. Um, so the people, once they're gathered together, it's up to them to define the category, uh, of membership.  and plaintiffs continually assert that the 1915 census descendants have a greater connection to this community than the other people. And that is simply not borne out by the record. Washburn recognized that the rancheria, when you have a small parcel of land like that, um, that not all the members of the community could reside on the parcel. And so he said that potential residents are potential members. Um, and again, he was not deciding membership, but the potential members would guide the view of what the larger tribal community is. When you go to talk about community, you mentioned the community, the community, you mean the community of this potential membership community, the community that we are sort of a rough draft of who might actually be members of this. That's correct. Because if they're known kinship ties with each other, that was just a terminology clarification. Because obviously there are people who live in the geographic community who may have. That's correct. The Miwok community and, and they identified themselves as Miwoks continually. Um, when Indian agent Terrell went to Calaveras County in 1915, he was sent to look for land, uh, in sheep ranch because it was a failing mining community. There was property to be sold. The government was looking for properties to buy. It was relatively close to employment. And so,  Terrell went there, um, to see about buying land. Um, and in his short time there, he identified, uh, 12 people who were either in sheep ranch, the town, or the Hodges were two and a half miles North of sheep ranch. But he specifically said that this is a fluid, um, uh, fluid group, um, that includes, um, other communities, uh, six mile Avery agents camp that were to some extent interchangeable in their relations. Um, I'd like to point out that the, this distinction,  that plaintiffs are making between, uh, lineal descendants and collateral descendants just depends on like what generation it is you focus on. If you go one generation older in time, um, these people are likely all lineal, uh, descendants, um, because of these, uh, community, these marriage relationships, um, and, uh, accompanying social relationships, but relates to a question that I had, which is about the mistaken preference premise that John Jeff was descended from Jeff Davis. And in correcting that, why was it reasonable for Mr. Newland to conclude, um, that all the 1929 descendants should be part of the eligible groups rather than just the descendants of John Jeff. Right. Um, and your honor, there were,  when the BIA looked at, um, the genealogies of people who had stepped forward, um, around 2007, I believe, um, raising their hand that they wish to participate in the organization of the tribe. Uh, BIA identified about 17 people who were 1929 census descendants. Um, other than the John Jeff descendants. So it's a small group of people, uh, including the 1929 census include me walks descendants who are now potentially members of other me walk tribes. Um, your honor, there are no other me walk tribes in Calaveras County. There are, uh, uh, ranch areas, uh, and recognized tribes some further miles away in the surrounding counties. Um, on the 1929 census, it did identify some, uh, Indians as to all of May and they were not, um, included as part of the organizing group. And also, um, BIA decided that people listed as me walk to all of May would not necessarily be included as part of the eligible group to organize. Although it could be left to the members,  once the, uh, in the organizing group and drafting the constitution, they could potentially have decided to include, uh, mixed me walk to all of May. Um, but, but anyway, it was, it wasn't necessary to include the John Jeff descendants in this 1st instance, or is that something that could be decided later on after our tribe is organized now? It because by excluding the John Jeff descendants, you ended up with 10 people. And that clearly is by no account, the larger tribal community, whenever this tribe, uh, has been asked to participate by, um, in 2007, as I said, uh, when BIA announced, we're going to hold an organizing meeting, please indicate if you're interested, they got about 250 responses. Um, when the tribe organized, uh, in 2013, and it was not through a secretarial election, um, they gathered together a list of 200 participants, um, in 2018, uh, as it turns out, um, when the tribe organized, um, after the Washburn decision, I think there were 279, um, people on their list that they recognize as this broader tribal community. Um, in the 2011 affidavits that were submitted in connection with the CVMT3 litigation, um, people describe the activities, the tribal activities that they engaged in together. So that the evidence throughout, whenever, uh, the Miwoks and Calaveras County were asked to raise their hands and say, do you consider yourself a part of this community? They have 250 people or so raising their hands. Uh, and that guided the decision and, and that is why your specific, uh, question about the, uh, the few people who were 1929 census descendants, but not John Jeff descendants, um, Washburn had, could have gone either way. And the interior has significant, um, discretion in its management of Indian affairs. Washburn said, well, I'm going to leave it to the tribe to decide, uh, about those people. But he said it could be proper. Um, it wasn't precluded. It could be proper. And Newland was guided by the fact when he looked, as I said, at the 2013 organizing effort and the 2018 organizing effort. In both cases, the tribal community, including plaintiffs in this case, Accepted, um, this group of 250 or so people to come together. But when people are raising their hands to be included is the BIA at that time, checking to see if they are indeed members of the California. Yes. Yes. Yes, they absolutely were. So you raise your hand, uh, and you submit a genealogy that shows how you're connected to, um, Miwok ancestors, and that is reviewed.  so, um, it was considered, I mean, the 1929 census was preceded by the 1920 census, the 1910 census. These were comprehensive censuses of Indians in Calaveras County. Um, and these names continually appear. They were known to the government. Um, after Jeff Davis passed away in 1940, and the land on the Rancheria, uh, was available, um, members of the community would contact BIA and say, we'd like to live there. And consistently through the forties, fifties, sixties, when the, uh, the land was disposed of to a 1929 census, uh, descendant, um, the BIA recognized 1929 census descendants. As eligible to live on the Rancheria giving no preference to 1915 census descendants. So the notion that somehow to have an ancestor, a lineal ancestor on the 1915 census gives you a special right or a special knowledge as a plaintiff seemed to be claiming now, um, either as a right to be the members or as special knowledge to give them a special status in organizing simply isn't supported by the record. And,  both, uh, and Newland well-documented his reasons for revising the Washburn decision as he did. I think your honors covered a lot of the material I would have covered in your questioning. And, uh, if you have further questions, should I follow up? The government is not asserting a right to decide the ultimate membership of this tribe. That's correct. The government is asserting a right to approve the organizing group or larger tribal community that will write a constitution and itself decide membership of the tribe. Correct?  And years ago, these plaintiffs or these petitioners agreed that the government plays that role.   And in fact, they brought legal challenges to the governments,  to make, to make sure that the government played that role correctly. That's correct. Okay. Then this, so that's very big picture. And then I have a very in the weeds question. There's a line in your brief. It says the U.S. currently holds the land in trust. I assume that means the ranch area.  For the benefit of the descendants of Mabel Dixie's heirs, who are not 1915 census descendants. Right. And then, uh, Ms. Walker said that Mabel Dixie's heirs have noticed. That's correct. Um, so, um, there is 1 descendant of Merle Butler, who was her common law husband,  to keep up. Um, and, um, she would be included under the 3rd eligible group. Okay, under the new decision under both. Yes, it's as you pointed out, your honor, it took me a long time to figure this out. It's Mabel Hodge Dixie, her heirs, and their descendants.  but her, her heirs descendants are not 1915 census descendants.  Okay. Yes. If that's all the questions, um, thank you very much, your honors. Thank you. Oh, I have to, I respect Ms. Bragg, but I have to disagree with how she's categorized. The Miwoks in Calaveras County is all having the right to be a member of Sheep Ranch. That is just not correct. Um,  you can have a lot of Sioux people in North Dakota. They're not all member of the same tribe. Uh, they have a lot of the same names. I represented Henry Jeff at the Troy Numbie, and he's on the coast of California. There's a lot of Jeff's, a lot of Miwoks in California, but they don't all belong at Sheep Ranch and not all the Miwoks in Calaveras County have that connection. For example, this is why it's, you know, you have to be a genealogist to get into this and I've done a lot of it, but basically, uh, what happened with, uh, Sheep Ranch is they, as Michael, uh, identified in his, in his affidavit, and this is what we stand on. He was fighting to overcome a woman that was trying a rogue leader to run off with their heritage, and they said they pulled together and they had a list of people that they were all part of this community over a number of years had lived there like Velma White Bear, uh, Miss Carson, and they were related to one of the Jeff families. It was the, uh, Hattie Jeff's because Maple's mother was Hattie Jeff, and that was the daughter of Tilly and John Jeff, but Hattie Jeff's, uh, relatives had a connection, some of them into Sheep Ranch, and her oldest sister, Laurel, they were close. Her line had a connection in the Sheep Ranch, but the other seven children of John Jeff did not, so not every John Jeff descendant has a right to be at Sheep Ranch, and what happens is, in America, uh, the reason why they don't just blanket bring in anybody that has Sioux blood or anybody has Miwok blood into their community is because people marry out. They marry out and they go into other communities, uh, whether they go into a white culture, a black culture, another culture, they don't come back. They're not part of the political community, and that's what we're talking about when you say political integrity. So, no, I disagree strongly that every Miwok on that 1929 census would have had a historical connection. So that's why I don't want you to get held up. I understand that, uh, in your view, the 1929 census descendants would be over inclusive. Yes. If we, if we did not allow the 1929 census descendants to be part of the organizing group, would that mean the organizing group is under inclusive? No. What Kevin Washburn said, and this is on J.  2, 6, 6. I mean, if it's, if it's, if the answer is it's under, and you say it's not under inclusive, it's not going to be under inclusive. That means that because it's not going to be limited to nine people or five people. Uh, Washburn said, whether the descendants of the Miwoks identified in the 1929 census shall be included in the organization of the CVMT is an internal tribal decision and shall be made by the individuals who make up the eligible groups. And he drops down the footnote and he talks about the controversy over Burley. And he says,  she can prove that she's got that connection. Then they can decide to bring her end and use the 20, as she shows up on the 29 census. But the point is not every Miwok came into there. They may have married out. They may have gone to other tribes and other parts of California. So that's why to just list those on that 29 census without any trace. And I, again, disagree, but that very paragraph seems to recognize the reasonableness of the not yet made Newland determination, broadening, uh, Washburn's baseline decision. He said in the previous sentence, including the descendants of the Miwok Indians identified on the 29 census as eligible to take part of the organization of the tribe may be proper in light of agent Terrell's conclusion that to some extent, the Indians, she branch Murphy's six mile Avery and angels are interchangeable in their relations. So she made a decision, as you point out, that would leave to the narrower group, the ultimate membership criteria reflected in the constitution. And if they wanted to, to encompass more of those people, Newland took a different default and said, let's have more people in the organizing group and they could go the other way. They could recognize, well, I'm belonging to a different tribe or the,  they have to do some kind of ideological discussion and connection to the region, the area, uh, recognition of different, you know, maybe independently walk tribes, but it seems like Wofford himself recognizes that a reasonable alternative route for BIA would be to do precisely what Newland then does. So the reason he came down with the three eligible groups was because the government's role was to identify that history. And then the tribes role is to identify its members. So he was saying that he's identifying history. Does the tribe exist? Like the remand decision demanded, you have to determine a tribe exists. He looked at historical roles to say,  sheep branch was identified and there are descendants today. The tribe exists. Then he's distinguishing. This is the point I'm trying to make. And I don't know if I can possibly be clear enough, but there's a big distinction in saying with Washburn, look, uh, sure. We have a general Calaveras County census of 1929 that identifies people that have interchangeable history, just like the Sioux, just like the Virginia tribes. They all have interchangeable ancestors, but that, but they have to then decide if those ancestors, which one come in. And like Michael Melinda's did and the others in their affidavit, there were some that had the Jeff descendancy and their ancestor, John Jeff was on the 29 role, but he was showing the history and they were showing the history of their connection to sheep branch, whether they had lived there, been part of a cultural, cultural things with them, but there is that history. Can I run, just run down the actual dispute that the government have had. They have this line in their brief us currently holds land and trust for the benefit of the descendants of Mabel Dixie's heirs who are not 1915 census descendants. You heard Ms. Sprague's explanation for why she thinks that's accurate. Do you also think it's accurate? The land was held in trust, like a reservation we know and trust for this tribe. It was designated. They were doing land purchases for the homeless Indians in California. And that two acres, they identified for the community around that sheep branch area. Cause I think they knew that sheep branch mining town. Is it, is the U S currently doing whatever that is for the descendants of Mabel Dixie's heirs? Well, that, that 0.9 acres just isn't like a residential community. It never, it never really was. It was, you know, Yakima was on there. Mabel was on there. Different people were on there, but that is not like being a resident of, um, you know, uh, a res, a big reservation like Crow agency or something. So. So I'm not sure I'm understanding that. The U S is doing with that land. It's doing it for the benefit of some group of people. It was the me walks around the sheep branch. Is it currently doing it for the benefit of Mabel Dixie's heirs descendants? No, because she has that deed. They, what they did is they transferred to Maple. The deed to the property. And then she, her heirs, and she left it to Yakima who left it to Thelma Thelma white bear, who lived at sheep branch, who their grandmothers were sisters. And so she was a cousin and she was in the, the rancheria, um, the sheep ranch, rancheria community. That's an example. Mabel Dixie's heirs have the deed. You just said, right? No, the deed to sheep branch is with Thelma white bear. Who was a cousin of Yakima because felt because Thelma's grandmother and Maple's mother were sisters. And so what Yakima did is he got the land and it was deeded to him. And then he passed his rights on to Velma, his cousin, who was a sheep branch me walk because she was in the community. So that's why this, um, the fact that government is saying, you can take all of me walks that descend from the 29 census that had no connection or their later generations connection back into that thing. And then let them have the tribe that violates the political integrity of the tribe. And that violates the remand. Okay. Did Ms. Brake say anything at oral argument about that sentence that was inaccurate? I don't remember if she, you know, I just,  that's what I know. And I have,  I know that Thelma's,  heirs have it. Anything further to chance? Yeah, because of the, I'm going backwards because of the IRA and the allotment, uh, era of the land that we were just talking about on the sheep ranch ranch area. Is that held in trust the same way a reservation is. No, it never was put in trust, like a regular reservation. Okay. And then, um, earlier when we're talking about the broader community, broader Miwok community reflected in,  Calaveras County, is there a difference on utilizing a broader community for purposes of your organization that it is for when you're actually determining, uh, self, uh, citizenship for yourself, for your self determination and self governance purposes. Yes. And that's a good question because, um, what we claim Newland did where he overreached was he designated this 1929 census to designate membership. And that's where, again, there's in Washburn's had it in his attachments. Attachment L, uh, by director Rissling had a solicitor's opinion that said, you cannot use the 29, uh, census as a membership criteria. It's too general. And so that, and Washburn's can't could have, but he didn't because he said that. That is for the tribe to determine whether somebody on that census has the right to membership in the tribe. Not me to say that everybody in the 1929 census should be in membership. Now, when you come to the putative group or the organizing group, what our position is, when you look at the affidavits of Melinda's and the group that he was with, they were identifying people that have had that history. So when the BIA sits down, if you all go back to the state, Newland went too far, overreach, that's arbitrary and capricious decision-making. Then what the BIA was starting to do was sit down with, uh, this group and look at people that requested to be part of the tribe and see if there's documentation that shows a historical connection, not only in name, but how they connected to that Miwok community in that area. Now that's, uh, it's just like, you know, I use Virginia because I know those tribes so well. The Pamunkey do not have land in trust. They have an old state reservation. A few miles away is the Matapanai. They have an old state reservation. Neither one of those pieces of property are in trust. And those properties aren't big enough to hold everybody that has Pamunkey heritage or Matapanai heritage. So they have membership with people both on that, live there on that old state reservation, people off. And that is so common, but they trace it back to who has a connection to that tribe. So it's not like everyone that, and they have interrelations. They have people with the same last name and those two tribes. So it's not about that. That's why I think the government overreached and I'm, I know I'm beating the same drum. And then the last question I had was just, um, there was a discussion in the district court's order about plaintiffs had been here several times, challenging things that they're now taking up a different position on. So I just wanted you to speak to that. I think it's very consistent. What they were fighting for in the beginning is they had a rogue leader come in and took the tribe and took the money and they were fighting that and they were on the side of, we want, you know, a legitimate, you know, legitimacy and they won. And then, uh, they, they had to challenge again and three because she challenged again and then they won. They got the remand, which said that, you know, the government had to go back and show number one, a historic community existed. And then they had to honor with their trust responsibility, the political integrity of the tribe. And that's the part I'm fighting over.  you know, it's, it's, um, gosh, it's nothing's harder than figuring out tribal membership. So I appreciate you all indulging with this conversation, but it's, it's a very big difference in Indian country between, um, being over inclusive and, and setting up the situation where the right people. And I mean, people with historic connection, uh, come into the tribe and the BIA can be a mediator and all that, because they can have the documents where they failed at was they didn't do their due diligence. And now they're trying to use that lack of due diligence against these folks. I represent that definitely have been fighting to have a broader community. That's what they fought for. If you look at those early cases, exactly, they said, we don't want our tribe being hijacked by Sylvia and her two children. Um, yeah, you've heard me enough, but thank you very much. I appreciate you. The case is submitted.
judges: Pillard; Walker; Childs